Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEROME MALONE, derivatively on behalf of DEXCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEVIN R. SAYER, JEREME M. SYLVAIN, STEVEN R. ALTMAN, NICK AUGUSTINOS, RICHARD A. COLLINS, KAREN DAHUT, RIMMA DRISCOLL, MARK G. FOLETTA, BRIDGETTE P. HELLER, KYLE MALADY, ERIC J. TOPOL, and BARBARA E. KAHN, <br><br> Defendants, <br><br> and <br><br> DEXCOM, INC., <br><br> Nominal Defendant. | Case No.: **'24CV1799 H    MSB** <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiff Jerome Malone ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant DexCom, Inc. ("DexCom" or the "Company") files this Verified Shareholder Derivative Complaint against Defendants Kevin R. Sayer ("Sayer"), Jereme M. Sylvain ("Sylvain"), Steven R. Altman ("Altman"), Nick Augustinos ("Augustinos"), Richard A. Collins ("Collins"), Karen Dahut ("Dahut"), Rimma Driscoll ("Driscoll"), Mark G. Foletta ("Foletta"), Bridgette P. Heller ("Heller"), Kyle Malady ("Malady"), Eric J. Topol ("Topol"), and Barbara E. Kahn ("Kahn") (collectively, the "Individual Defendants", and together with DexCom, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of DexCom, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Sayer and Sylvain for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DexCom, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and officers of DexCom from January 8, 2024 through July 25, 2024, both dates inclusive (the "Relevant Period").

2.      Headquartered in San Diego, California, Dexcom is a medical device company primarily focused on the design, development and commercialization of continuous glucose monitoring ("CGM") systems for the management of diabetes by patients, caregivers, and clinicians around the world. In 2006, the Company received its first approval from the United States Food and Drug Administration ("FDA") for its first product. In 2018, Dexcom launched its latest generation systems, the Dexcom G6® integrated Continuous Glucose Monitoring System, or G6. More recently, the Company received marketing clearance from the FDA on the Dexcom G7®, or G7, in December 2022 and began marketing the G7 as an upgrade from the G6 model in early 2023.

3.      During the Relevant Period, the Individual Defendants repeatedly overrepresented the Company's growth capabilities to attain more patients, surpass the previous fiscal year's gross margins, and scale patient conversion to the G7. Additionally, while making these materially false and misleading statements, the Individual Defendants failed to disclose that the Company's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants and further downplayed the impact seasonality would have on the business.

4.      Five of the Individual Defendants—Sayer, Sylvain, Foletta, Heller, and Altman—took great advantage of the scheme to issue materially false and misleading statements by engaging in insider trading while the Company's common stock traded at artificially inflated prices as a result of their materially false and misleading statements. Collectively, their personal profits exceeded *$25.6 million*[1] during the Relevant Period.

5.      The truth emerged on July 25, 2024, when the Company issued a press release that revealed DexCom's poor financial performance for the second quarter of the fiscal year ending December 31, 2024 (the "2024 Fiscal Year"), which the press release stated was partly due to "slower-than-expected new customer growth."

6.      On this news, the price of the Company's common stock fell $43.85 per share,

---

[1] All emphasis is added unless otherwise noted.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

or approximately 40.66%, from its closing price of $107.85 per share on July 25, 2024, to close at $64.00 per share on July 26, 2024.

7.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

9.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

10.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.    The Individual Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), its Executive Chairman, its President, and its Executive Vice President and Chief Financial Officer ("CFO") to being named defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California (the "Securities Class Action").

12.     Moreover, the Company must undertake internal investigations and needs to implement adequate internal controls over its financial reporting.

13.     Due to the Individual Defendants' breaches of fiduciary duties, the Company has and will be forced to expend millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, of the collective engagement in fraud and misconduct by the Company's directors, of their being beholden to one another and to various of the Individual Defendants, of their receipt of material personal benefits as a result of the Individual Defendants' misconduct, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Sayer's and Sylvain's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this

District, or he or she has, directly or indirectly, used the means and instrumentalities of interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff Malone is a current shareholder of DexCom. Plaintiff purchased Company common stock on February 18, 2022 and has continuously held DexCom common stock since that time.

### Nominal Defendant DexCom

22.     DexCom is a Delaware corporation with its principal executive offices at 6340 Sequence Drive, San Diego, California 92121. DexCom's common stock trades on the N ASDAQ under the ticker symbol "DXCM."

### Defendant Sayer

23.     Defendant Sayer has served as a Company director since November 2007, as Chairman of the Board since July 2018, as the Company's President since 2011, and as the Company's CEO since January 2015. Previously, he served as the Company's Chief Operations Officer ("COO") from January 2013 until January 2015. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 22, 2024 (the "2024 Proxy Statement"), as of March 27, 2024, Defendant Sayer beneficially owned 223,925 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Sayer owned approximately $31.2 million worth of DexCom stock as of that

date.

24.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sayer made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 37,325 | $123.64 | $4,614,676 |
| March 12, 2024 | 81,007 | $133.19 | $10,788,998 |
| April 8, 2024 | 49,633 | $138.34 | $6,865,981 |

Thus, in total, before the fraud was exposed, he sold 167,965 shares of Company stock on inside information, for which he received approximately $22.3 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.    The 2024 Proxy Statement stated the following about Defendant Sayer:

Kevin R. Sayer has served on our Board since November 2007, as our President and Chief Executive Officer ("CEO") since January 2015 and as our Chairperson of the Board ("Chairperson") since July 2018. Mr. Sayer has been our President since 2011, and from January 2013 until January 2015, Mr. Sayer also served as our Chief Operating Officer. From April 2007 to December 2010, Mr. Sayer served as Chief Financial Officer of Biosensors International Group, Ltd. ("Biosensors"), a medical technology company developing, manufacturing and commercializing medical devices used in interventional cardiology and critical care procedures. Prior to joining Biosensors, from May 2005 to April 2007, Mr. Sayer served as an independent healthcare and medical technology industry consultant. From March 2004 to May 2005, Mr. Sayer was Executive Vice President and Chief Financial Officer of Specialty Laboratories, Inc., a company offering clinical reference laboratory services. From August 2002 to March 2004, Mr. Sayer worked as an independent healthcare and medical technology industry consultant. Mr. Sayer served as Chief Financial Officer of MiniMed, Inc. from May 1994 until it was acquired by Medtronic, Inc. in August 2001. Mr. Sayer served as Vice

President and General Manager of Medtronic MiniMed after the acquisition until August 2002. Mr. Sayer is a Certified Public Accountant (inactive) and received his Master's Degree in Accounting and Information Systems concurrently with a B.A., both from Brigham Young University. As CEO, Mr. Sayer has direct responsibility for our strategy and operations.

**Defendant Sylvain**

26.    Defendant Sylvain has served as the Company's CFO since March 2021 and as its Chief Accounting Officer ("CAO") since March 2020. Previously, Defendant Sylvain served as the Company's Senior Vice President, Finance from March 2020 until March 2021. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Sylvain beneficially owned 32,122 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Sylvain owned approximately $4.5 million worth of DexCom stock as of that date.

27.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sylvain made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 2,734 | $123.64 | $338,018 |
| February 20, 2024 | 3,363 | $116.73 | $392,562 |
| March 12, 2024 | 11,661 | $134.41 | $1,567,366 |
| June 10, 2024 | 745 | $115.05 | $85,712 |

Thus, in total, before the fraud was exposed, he sold 18,503 shares of Company stock on inside information, for which he received approximately $2.4 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.    The 2024 Proxy Statement stated the following about Defendant Sylvain:

Jereme M. Sylvain has served as our Chief Financial Officer since March 2021, and has served as our Chief Accounting Officer since March 2020. Prior to his role as Chief Financial Officer, Mr. Sylvain served as our Senior Vice President, Finance and Chief Accounting Officer since March 2020, and joined Dexcom in September 2018 as our Vice President, Finance and Corporate Controller. Prior to joining Dexcom, Mr. Sylvain held various positions at NuVasive, Inc., including Vice President, Corporate Controller and Chief Accounting Officer from August 2016 to September 2018 and Vice President, Corporate Controller from March 2014 to August 2016. Prior to joining NuVasive, Inc. Mr. Sylvain held the role of Senior Director, Finance with Thermo Fisher Scientific, where he was responsible for global accounting for the life sciences solutions group. Mr. Sylvain joined Thermo Fisher Scientific in February 2014, following its acquisition of Life Technologies Corporation. From July 2007 to February 2014, Mr. Sylvain held multiple finance and accounting roles at Life Technologies and its predecessor, Invitrogen Corporation. Prior to joining Invitrogen, Mr. Sylvain worked for the public accounting firm Ernst & Young LLP. Mr. Sylvain obtained his Certified Public Accounting license after receiving a B.A. in Finance from Arizona State University and a M.S. in Accountancy from the University of Notre Dame.

**<u>Defendant Altman</u>**

29.    Defendant Altman has served as a Company director since 2013. He is also a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Altman beneficially owned 56,017 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Altman owned approximately $7.8 million worth of DexCom stock as of that date.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Altman made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 16, 2024 | 1,568 | $122.60 | $192,239 |

Thus, in total, before the fraud was exposed, he sold 1,568 shares of Company stock on inside information, for which he received approximately $192,239 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.    The 2024 Proxy Statement stated the following about Defendant Altman:

Steven R. Altman has served on our Board since November 2013. From January 2021 to December 2023, Mr. Altman served as the Chairman of the Board of Directors of Prospector Capital Corporation, a publicly-traded blank check company, prior to the completion of a business combination between Prospector Capital and LeddarTech Holdings Inc. in December 2023. From November 2011 through January 2014, Mr. Altman served as the Vice Chairman of Qualcomm Incorporated ("Qualcomm") and a member of Qualcomm's Executive Committee. Mr. Altman previously served as President of Qualcomm from July 2005 to November 2011, as Executive Vice President from November 1997 to June 2005 and as President of Qualcomm Technology Licensing from September 1995 to April 2005. Mr. Altman was the chief architect of Qualcomm's strategy for licensing its broad intellectual property portfolio for wireless communications, which has accelerated the growth of CDMA technology. Mr. Altman received a B.S. from Northern Arizona University in Political Science and Administration and a J.D. from the University of San Diego. Mr. Altman brings to the Board significant senior leadership, and technical and global experience. Mr. Altman's experiences with Qualcomm allow him to provide Dexcom with valuable insights on corporate strategy and initiatives that are critical to the continued growth and maturation of Dexcom.

**Defendant Augustinos**

32.    Defendant Augustinos has served as a Company director since 2009. He is also a member of the Nominating and Governance Committee. According to the 2024

Proxy Statement, as of March 27, 2024, Defendant Augustinos beneficially owned 37,083 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Augustinos owned approximately $5.1 million worth of DexCom stock as of that date.

33.    The 2024 Proxy Statement stated the following about Defendant Augustinos:

Nicholas Augustinos has served on our Board since November 2009. From December 2015 through December 2018, Mr. Augustinos served as President and CEO of Aver, Inc. dba Enlace Health, a company specializing in Value-Based Reimbursement, Analytics and Payment Solutions. He has served on the Board of Directors of Aver since September 2014, and was Chairman of the Board of Directors of Aver during 2019. From November 2011 until December 2015, Mr. Augustinos was with Cardinal Health, Inc. (NYSE: CAH) as its Senior Vice President for Health Information Services and Strategy. From March 2005 through October 2011, Mr. Augustinos worked at Cisco Systems, Inc. (NASDAQ: CSCO), the global leader in networking and cloud solutions. At Cisco, he held various positions, including Director of Cisco's Internet Business Solutions Group, Senior Director, Global Healthcare Solutions Group, and Senior Director of Global Healthcare Operations. In January 2015, Mr. Augustinos was appointed to the Board of Directors of the California Health Care Foundation ("CHCF"), an endowed foundation which seeks to improve care for all Californians through innovations that improve quality, increase efficiency, and lower the cost of care. He serves at the Finance & Investment Committee and the Governance Committee which he chaired for three years. Prior to CHCF, he served on the Board of Directors of the SCAN Foundation, an endowed foundation dedicated to advancing the development of a sustainable continuum of quality care for seniors, from June 2011 until December 2014. Mr. Augustinos served on the Board of Directors of Audax Health, now Rally, from March 2012 until February 2014. Rally was acquired by UnitedHealthcare. In 1992 Mr. Augustinos joined Deloitte Consulting where he was instrumental establishing the healthcare practice for Northern California. In 1998 Mr. Augustinos joined Healtheon/WebMd (NASDAQ: HLTH), a newly founded healthcare information technology company leading the Customer Experience team. With a 38-year career in healthcare and healthcare technology, Mr. Augustinos has broad managerial, consulting and business development experience in the private and public sectors. Mr. Augustinos has worked with a diverse range of leading healthcare delivery systems, healthcare insurers and

government organizations globally and brings to the Board significant business and market development and technology experience with growth companies.

**Defendant Collins**

34.    Defendant Collins has served as a Company director since 2017. He is also a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Collins beneficially owned 39,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Collins owned approximately $5.5 million worth of DexCom stock as of that date.

35.    The 2024 Proxy Statement stated the following about Defendant Collins:

Richard A. Collins has served on our Board since March 2017. Mr. Collins has been a self-employed consultant since October 2013. From March 2011 to October 2013 Mr. Collins was the Chief Executive Officer for UnitedHealthcare's Northeast Region and was President, Director, and/or Chairman of numerous UnitedHealthcare subsidiaries including Oxford Health Plans, Mid Atlantic Medical Services and UHC Insurance Company of New York. From July 2005 through December of 2012 Mr. Collins served as the President – Individual Line of Business for UnitedHealthcare and the Chairman and Chief Executive Officer of Golden Rule Financial Corporation. Prior to 2011, Mr. Collins also held leadership positions in pricing, underwriting and healthcare economics with UnitedHealthcare. Mr. Collins has previously served on the Boards of Fairbanks Hospital in Indianapolis, Indiana, The Nature Conservancy – Indiana, United Healthcare Children's Foundation and the Council for Affordable Health Insurance. Mr. Collins received a B.S. from Maine Maritime Academy and completed the executive development program at Harvard University's John F. Kennedy School of Government. Mr. Collins was formerly a National Association of Corporate Directors (NACD) Board Leadership Fellow. The NACD Fellowship is a comprehensive and continuous program of study that empowers directors with the latest insights, intelligence, and leading boardroom practices. Mr. Collins' significant experience in healthcare insurance and administration, including his tenure during a period in which UnitedHealth Group grew from a mid-cap health insurer into one of the largest public corporations in America, qualify him to serve on the Board.

**Defendant Dahut**

36.     Defendant Dahut has served as a Company director since 2020. She is also a member of the Compensation Committee and the Technology Committee.  According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Dahut beneficially owned 15,166 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Dahut owned approximately $2.1 million worth of DexCom stock as of that date.

37.     The 2024 Proxy Statement stated the following about Defendant Dahut:

Karen Dahut has served on our Board since August 2020. In October 2022, Ms. Dahut was selected as the CEO of Google Public Sector, responsible for helping public sector clients digitally transform with the Google suite of products. Prior to this role, Ms. Dahut was the Sector President for Booz Allen's Global Defense business. Ms. Dahut held several leadership positions throughout the organization, including Chief Innovation Officer; Leader, Analytics and Data Science Business; and Leader, Economic and Business Analytics Capability. Before joining Booz Allen in 2002, Ms. Dahut served as comptroller for the Navy's premier biomedical research institute and as a United States Naval Officer. Ms. Dahut also actively serves on the Board of Directors for the National Air and Space Museum and the Center for New American Security. Additionally, Ms. Dahut has served as a Director of EisnerAmper LLP since August 2021. She previously served on the Board of Directors of Tech Data Corporation, an end-to-end technology distributor and Fortune 100 company, prior to its acquisition by Apollo Global Management in June 2020. Ms. Dahut received a Bachelor's degree in Finance from Mount Saint Mary's University and a Master's of Science degree from the University of Southern California's Viterbi School of Engineering. Ms. Dahut's considerable leadership experience qualifies her to serve on the Board.

**Defendant Driscoll**

38.     Defendant Driscoll has served as a Company director since August 2023. She is also a member of the Audit Committee and the Technology Committee.  According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Driscoll beneficially owned 4,008 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Driscoll owned approximately $559,035 worth of DexCom stock as of that date.

39.    The 2024 Proxy Statement stated the following about Defendant Driscoll:

Rimma Driscoll has served on our Board since August 2023. Ms. Driscoll currently serves as Executive Vice President and Head of Global Strategy, Commercial and Business Development, and Global BioDevices of Zoetis, the world's leading animal health company and a member of the Fortune 500. In this role, Ms. Driscoll oversees the company's global business strategy, the execution of commercial launch plans, external business development (M&A) and integration efforts, and has oversight for Zoetis' Global BioDevices business. She joined Zoetis in 2016 and previously held the titles of Senior Vice President, Business Development from January 2020 to November 2022; and Vice President, Business Development and Commercial Alliances from 2016 to January 2020. Prior to joining Zoetis, Ms. Driscoll spent 21 years at Procter & Gamble where she led global business development and strategic alliances across multiple businesses in pharmaceuticals, consumer healthcare, beauty care, and new business ventures. Ms. Driscoll is a board member of Pumpkin Insurance, a preventive care and pet insurance company. Ms. Driscoll completed her Master of Business Administration from Xavier University, Williams College of Business, and her Bachelor of Science in Chemistry from Bowling Green State University. Ms. Driscoll is qualified to serve on our Board of Directors because of her significant experience leading business development initiatives and corporate strategy.

**Defendant Foletta**

40.    Defendant Foletta has served as a Company director since 2014. He is also the Chair of the Audit Committee and the Lead Independent Director of the Board. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Foletta beneficially owned 62,398 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Foletta owned approximately $8.7 million worth of DexCom stock as of that date.

41.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Foletta made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| June 17, 2024 | 2,694 | $116.70 | $314,400 |
| June 18, 2024 | 3,306 | $117.00 | $386,792 |

Thus, in total, before the fraud was exposed, he sold 6,000 shares of Company stock on inside information, for which he received approximately $701,192 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.    The 2024 Proxy Statement stated the following about Defendant Foletta:

Mark G. Foletta has served on our Board since November 2014 and has served as our Lead Independent Director since November 2015. From February 2017 to June 2020, Mr. Foletta was the Chief Financial Officer and Executive Vice President of Tocagen, Inc., a publicly traded biotech company. From August 2015 to July 2016, Mr. Foletta served as the interim CFO of Biocept, Inc., an early commercial-stage publicly traded molecular oncology diagnostics company. Mr. Foletta previously served as Senior Vice President, Finance and Chief Financial Officer of Amylin Pharmaceuticals, Inc., a publicly traded pharmaceutical company, from March 2006 through Amylin's acquisition by Bristol Myers-Squibb Company in August 2012, and as Vice President, Finance and Chief Financial Officer of Amylin from 2000 to 2006. Prior to joining Amylin in 2000, Mr. Foletta held a number of management positions with Intermark, Inc. and Triton Group Ltd. from 1986 to 2000 and served as an Audit Manager with Ernst & Young. Mr. Foletta is currently a member of the Board of Directors and Audit Committee of AMN Healthcare Services, Inc., a publicly traded healthcare workforce solutions provider. He also is a member of the Board of Directors and Audit Committee of Enanta Pharmaceuticals, Inc. since July 2020. Mr. Foletta received a B.A. in Business Economics from the University of California, Santa Barbara and is a member of the Corporate Directors Forum. Mr. Foletta's considerable audit and

financial experience in the biotechnology and pharmaceutical sectors qualifies him to serve on the Board.

**Defendant Heller**

43. Defendant Heller has served as a Company director since 2019. She is also a member of the Compensation Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Heller beneficially owned 23,731 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Heller owned approximately $3.3 million worth of DexCom stock as of that date.

44. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Heller made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 14, 2024 | 1,000 | $113.55 | $113,550 |

Thus, in total, before the fraud was exposed, she sold 1,000 shares of Company stock on inside information, for which she received approximately $113,550 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

45. The 2024 Proxy Statement stated the following about Defendant Heller:

Bridgette P. Heller has served on our Board since September 2019. Ms. Heller is currently leading a small nonprofit, the Shirley Proctor Puller Foundation, committed to generating better educational outcomes for underserved children in St. Petersburg, Florida. Previously, Ms. Heller served as the Executive Vice President and President of Nutricia, the Specialized Nutrition Division of Danone from July 2016 to August 2019. From 2010 to 2015, she served as Executive Vice President of Merck & Co., Inc. and President of Merck Consumer Care. Prior to joining Merck, Ms. Heller was President of Johnson & Johnson's Global Baby Business Unit from 2007 to 2010 and President of its Global Baby, Kids, and Wound Care business from 2005 to 2007. She also

worked for Kraft Foods from 1985 to 2002, ultimately serving as Executive Vice President and General Manager for the North American Coffee Portfolio. Ms. Heller serves on the Board of Directors of Novartis, a global pharmaceuticals manufacturer and Fortune 200 company. She also serves on the Board of Directors of Newman's Own, a privately held social business and food manufacturer. Since February 2021, Ms. Heller has served on the Board of Directors of Aramark Corporation, a U.S. publicly traded food service and facilities provider and on the Board of Directors for Integral Ad Science, a U.S. publicly traded global media measurement and optimization company. Ms. Heller received her Bachelor's degree in Economics and Computer Studies from Northwestern University and an MBA from Northwestern University's Kellogg Graduate School of Management, where she is also a member of the school's Advisory Board. Ms. Heller brings to our Board considerable experience in business, specifically as it relates to technology and manufacturing, and she is a strong addition to the Board as Dexcom continues to expand and scale its operations.

**Defendant Malady**

46.    Defendant Malady has served as a Company director since 2020. He is also a member of the Nominating and Governance Committee and the Technology Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Malady beneficially owned 15,529 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Malady owned approximately $2.2 million worth of DexCom stock as of that date.

47.    The 2024 Proxy Statement stated the following about Defendant Malady:

Kyle Malady has served on our Board since October 2020. Currently, Mr. Malady serves as EVP and CEO of the Verizon Business Group, a unit of Verizon Communications Inc., a telecommunications company. Previously Mr. Malady served as Executive Vice President of Global Networks and Technology and Chief Technology Officer at Verizon since August 2018. Prior to assuming this role, Mr. Malady was head of the Core Engineering and Operations organization within the Global Network and Technology organization at Verizon from May 2012 to July 2018. He has also served as Verizon's Vice President of New Product Development from June 2005 to April 2012. Mr. Malady is currently on the board of the CTIA, the wireless

industry's trade association. Mr. Malady also serves on the President's National Security Telecommunications Advisory Council (NSTAC). Mr. Malady received a B.S. in Mechanical Engineering from the University of Bridgeport and an MBA in Finance from the NYU Stern School of Business. Mr. Malady's experience in numerous fields at Verizon provides him with insights and guidance that qualify him to serve on the Board.

**Defendant Topol**

48.     Defendant Topol has served as a Company director since 2009. He is also a member of the Technology Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Topol beneficially owned 377,927 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Topol owned approximately $52.7 million worth of DexCom stock as of that date.

49.     The 2024 Proxy Statement stated the following about Defendant Topol:

Eric J. Topol, M.D. has served on our Board since July 2009. Since January 2007, Dr. Topol has served as the Director of the Scripps Translational Science Institute, a National Institutes of Health funded program of the Clinical and Translational Science Award Consortium. He is Executive Vice President and Professor of Molecular Medicine at the Scripps Research Institute, and a senior consulting cardiologist at Scripps Clinic. Prior to Scripps, Dr. Topol served on the faculty of Case Western Reserve University as a professor in genetics, chaired the Department of Cardiovascular Medicine at Cleveland Clinic for 15 years and founded the Cleveland Clinic Lerner College of Medicine. Dr. Topol serves as a digital medical advisor to Blue Cross Blue Shield Association. In April 2009, he co-founded the West Wireless Health Institute, a non-profit foundation for applied medical research and policy on the prevention of aging. As a practicing physician, academic and thought leader in wireless healthcare technologies, Dr. Topol is uniquely situated to provide the Board with guidance on its technology, clinical and market development.

**Defendant Kahn**

50.     Defendant Kahn served as a Company director from 2011 until May 22, 2024. She was also a member of the Audit Committee and the Compensation Committee. According to the 2024 Proxy Statement, as of March 27, 2024, Defendant Kahn

beneficially owned 25,502 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2024 was $139.48, Defendant Kahn owned approximately $3.6 million worth of DexCom stock as of that date.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.    By reason of their positions as officers and directors, and/or fiduciaries of DexCom and because of their ability to control the business and corporate affairs of DexCom, the Individual Defendants owed DexCom and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DexCom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DexCom and its shareholders so as to benefit all shareholders equally.

52.    Each director and officer of the Company owes to DexCom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of DexCom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.    To discharge their duties, the controlling shareholder, officers and directors of DexCom were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein

involves a knowing and culpable violation of their obligations as directors and officers of DexCom, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

56.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of DexCom were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to DexCom's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how DexCom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of DexCom and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DexCom's operations would comply with all applicable laws and DexCom's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to DexCom and the shareholders the duty of loyalty requiring that each favor DexCom's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.    At all times relevant hereto, the Individual Defendants were the agents of each other and of DexCom and were at all times acting within the course and scope of such agency.

60.    Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with DexCom, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

61.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DexCom.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate

applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and Individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of DexCom was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DexCom and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

67.     Headquartered in San Diego, California, Dexcom is a medical device company primarily focused on the design, development and commercialization of CGM systems for the management of diabetes by patients, caregivers, and clinicians around the world. In 2006, the Company received its first approval from the FDA for its first product. In 2018, Dexcom launched its latest generation systems, the Dexcom G6® integrated Continuous Glucose Monitoring System, or G6. More recently, the Company received marketing clearance from the FDA on the Dexcom G7®, or G7, in December 2022 and began marketing the G7 as an upgrade from the G6 model in early 2023.

68.     During the Relevant Period, the Individual Defendants repeatedly overrepresented the Company's growth capabilities to attain more patients, surpass the previous fiscal year's gross margins, and scale patient conversion to the G7. Additionally,

while making these materially false and misleading statements, the Individual Defendants failed to disclose that the Company's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants and further downplayed the impact seasonality would have on the business.

69.    Five of the Individual Defendants—Sayer, Sylvain, Foletta, Heller, and Altman—took great advantage of the scheme to issue materially false and misleading statements by engaging in insider trading while the Company's common stock traded at artificially inflated prices as a result of their materially false and misleading statements. Collectively, their personal profits exceeded **$25.6 million** during the Relevant Period.

70.    The truth emerged on July 25, 2024, when the Company issued a press release that revealed DexCom's poor financial performance for the second quarter of the 2024 Fiscal Year, which the press release stated was partly due to "slower-than-expected new customer growth."

71.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **False and Misleading Statements**

### *January 8, 2024 Press Release*

72.    On January 8, 2024, the Company issued a press release that reported DexCom's preliminary financial performance for the fourth quarter and full year ended December 31, 2023 ("2023 Fiscal Year"). The press release provided 2024 Fiscal Year guidance of  "total revenue of approximately $4.15 billion to $4.35 billion, representing expected organic growth of approximately 16% to 21% over 2023."

*January 8, 2024 J.P. Morgan 42nd Annual Healthcare Conference*

73.    That same day, on January 8, 2024, Defendant Sylvain represented DexCom at the J.P. Morgan 42nd Annual Healthcare Conference. During the conference, Defendant Sylvain affirmed DexCom's 2024 Fiscal Year guidance:

So I think when you think about guidance, there's a couple of different things in there. So first and foremost, what is now excluded in that number, the raw top line number is our non-CGM business, with the expectation that, that comes out of the business. So there is an assumption there.

*In terms of that growth, it does assume another year of record new patients. So I think global record new patients.* I think you can presume that there it does, when Kevin said a modest contribution from our non-insulin product, our 15-day product, we assume about 1 point of revenue associated with that. So that gives you some context around that.

And the rest is healthy growth really across the board in basal and the intensive population globally. *As you move down the line, you think about gross margin, if you rewind back to 2023, we really started 2023 with a 62% to 63% gross margin, and we're going to outpace that this year.* Some of that is just due to the timing of transition from G6 to G7. So Kevin alluded to it earlier. The expectation is, as we move through that transition, there's a little bit of that. So some of that's embedded. It doesn't change our long-term plans. Ultimately, we are on track for the cost profile we would expect on G7 at $10 sensor. And I would expect us to continue to make progress. There is no 15-day intensive insulin or G-Series product assumptions on gross margin in there. So hopefully, that's a little bit helpful. And then the continuation of leverage through the P&L, I think you'd expect to continue to see us do that. *We had a really strong year in 2022, 2023 in terms of driving leverage. That leverage continues as we move into 2024.*

*February 8, 2024 Form 8-K*

74.    On February 8, 2024, the Company filed a current report on Form 8-K with the SEC that reported DexCom's financial performance for the fourth quarter and full year of the 2023 Fiscal Year. The Form 8-K also affirmed the Company's guidance for the 2024 Fiscal Year.

***February 8, 2024 Earnings Conference Call***

75.    That same day, on February 8, 2024, the Company held an earnings conference call to discuss DexCom's financial performance for the fourth quarter and full year of the 2023 Fiscal Year. During the call, Defendant Sylvain stated the following, in relevant part:

> Turning to 2024 guidance. As we stated last month, we anticipate total revenue to be in the range of $4.15 billion to $4.35 billion, representing organic growth of 16% to 21% for the year. This guidance assumes continued momentum in the type 2 basal-only population in the U.S., the expansion of Dexcom ONE on the G7 platform into new geographies, and the launch of Stelo in the summer of 2024. It also assumes the divestiture of our non-diabetes distribution business in Australia and New Zealand this quarter, which represented around $30 million of revenue in 2023. From a margin perspective, we expect full year non-GAAP gross profit margin to be in a range of 63% to 64%, operating profit margin to be approximately 20%, and adjusted EBITDA of approximately 29%. ***Our gross margin guidance reflects the ongoing conversion from G6 to G7 within our customer base and the associated scale that comes with that process.*** Below gross margin, we'll continue to be very diligent with our spend in 2024, while investing strategically behind multiple growth opportunities.

***March 5, 2024 Raymond James Institutional Investors Conference***

76.    On March 5, 2024, Sean Christensen, the Company's Director of Corporate Affairs and Head of Investor Relations, stated the following regarding DexCom's 2024 Fiscal Year guidance, in relevant part, at the 45th Annual Raymond James Institutional Investors Conference:

> For 2024, we expect this significant growth to continue. We've guided our top line growth for the year to 16% to 21% organic growth. Gross margin for the year is 63% to 64%, which is relatively flat, slightly down versus 2023.

*Really, we're in the process of transitioning from our G6 hardware platform to our G7. And so as we build volumes, that will help us to scale and drive greater margin efficiency at the gross margin level*, continued operating margin expansion to about 20% and adjusted EBITDA margin of 29% forecast for this year. You see some of the assumptions there. But I think for us, this is a year in which we build on the access expansion that we had last year and continue to capitalize both within the U.S. and internationally.

If you think about then how do we execute on this vision and the strong growth opportunity, it really starts with an excellent product, and that's what we have in G7. With DexCom G7, we have what we believe to be new standard in CGM technology around the world. G7 is the most accurate CGM that has been cleared by the FDA and offering that standard DexCom performance that people have come to expect and trust over the years

. . .

And DexCom CGM with G7 is also the most covered CGM in the U.S. We fought incredibly hard to ensure that our patients not only have access to the technology, but have as low of an out-of-pocket cost as possible, given that they rely on this for managing a complex condition. And in doing so, we've been able to really expand our coverage and lead the industry with robust coverage. But we're not sitting still on DexCom G7. We continue to expand and innovate. And so we've talked about expanding the sensor wear from the current 10.5 day to what we hope will be a 15-day sensor wear. That has entered kind of the clinical testing phase that we talked about last year when we introduced these enhancements to the G7 platform at our Investor Day, so we continue to build. And obviously, that would be a nice benefit for our users and certainly for us from a cost perspective, if we can move from a 3 sensor per month to 2 sensor per month dynamic.

We also continue to make sure that we're driving the most volume to our G7 platform so that we can get the most out of the automated lines and manufacturing scale that we've built out in our San Diego, Mesa, Arizona and Malaysia manufacturing facilities.

**2024 Proxy Statement**

77.    On April 22, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Kahn, Malady, and Topol pursuant to Section

14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

78.     The 2024 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board; (2) the ratification of Ernst & Young LLP as the Company's independent auditors for the 2024 Fiscal Year; and (3) executive compensation, on an advisory basis.

79.     Regarding the Board's Role in Risk Oversight, the 2024 Proxy Statement stated the following, in relevant part:

> The Board is ultimately responsible for overseeing our risk assessment and risk management. In fulfilling this oversight role, our Board focuses on understanding the nature of our enterprise risks, including our operations and strategic direction, as well as the adequacy of our risk management process and overall risk management system. While the full Board has overall responsibility for risk oversight, the Board has delegated oversight responsibility related to certain risks to the standing committees of the Board.
>
> At its regularly scheduled meetings, the Board receives management updates and committee reports regarding business operations, financial results, committee activities, strategy, and discusses risks related to the business. Through management updates and committee reports, the Board monitors our risk management activities, including the enterprise risk management process and cybersecurity risks, risks relating to our compensation programs, and financial, legal and operational risks.

80.     With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated the following:

> We have adopted a Code of Conduct that is an essential resource for all of our officers, directors and employees. It outlines our values on a number of issues affecting our business, sets requirements for business conduct, and serves as the basis for our compliance program. The Nominating and Governance Committee reviews and assesses the adequacy of the Code of Conduct on at least an annual basis, and may recommend that the Board establish special

committees as may be desirable or necessary from time to time in order to address ethical, legal or other matters that may arise.

We encourage employees to keep open lines of communication with their supervisor and/or department management. Our compliance Intranet website provides additional information, including a global directory of compliance personnel; links to our compliance helpline; current policies, procedures, and resources; and training materials. The compliance helpline is hosted by a third-party helpline provider. Reports through the compliance helpline may remain anonymous.

When required by the rules of Nasdaq, or the SEC, we will disclose any future amendment to, or waiver of, any provision of the Code of Conduct for our principal executive officer and principal financial officer or any member or members of our Board on our website within four business days following the date of such amendment or waiver.

81.    The 2024 Proxy Statement emphasized the demand for the G7 product, stating that "[d]emand for Dexcom CGM remained high behind the rollout of our newest generation product, Dexcom G7, and we significantly expanded access globally. . . . This past year, we increased our prescriber base by approximately 40% in the United States as Dexcom G7's ease of use and leading performance attracted new clinicians to our ecosystem."

82.    The 2024 Proxy Statement also represented that the Audit Committee is charged with, among other things, "[o]verseeing [Dexcom's] accounting and financial reporting processes and the audits of [its] financial statements," "[m]onitoring the periodic reviews of the adequacy of [Dexcom's] accounting and financial reporting processes and systems of internal control," and "[r]eviewing with management [Dexcom's] major financial risk exposures and the steps management has taken to monitor or mitigate such exposures."

83.    The 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make

the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

84.     The 2024 Proxy Statement was also false and misleading because it failed to disclose that: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

85.     As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Kahn, Malady, and Topol causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *April 25, 2024 Press Release*

86.     On April 25, 2024, the Company issued a press release that reported DexCom's financial performance for the first quarter of the 2024 Fiscal Year and also revised DexCom's 2024 Fiscal Year guidance upward. The press release featured a quote from Defendant Sayer which represented the following:

> Dexcom is off to a great start in 2024, delivering another quarter of strong financial results while advancing several key strategic initiatives.
> * * *

This is shaping up to be another exciting year for Dexcom as we launch new product innovations and work to improve access to Dexcom CGM around the world.

***April 25, 2024 Earnings Conference Call***

87.    That same day, on April 25, 2024, the Company held an earnings conference call to discuss DexCom's financial performance for the first quarter of the 2024 Fiscal Year. During the call, Defendant Sylvain stated the following, in relevant part:

> Turning to guidance. We are raising the midpoint of our revenue guidance with an updated range of $4.20 billion to $4.35 billion, representing organic growth of 17% to 21% for the year. For margins, we are reaffirming our prior full year guidance of non-GAAP gross profit margin in a range of 63% to 64%, non-GAAP operating margin of approximately 20% and adjusted EBITDA margin of approximately 29%.

88.    During the Q&A portion of the earnings conference call, Robert Justin Marcus, an analyst from J.P. Morgan Chase, asked Defendant Sylvain the following question:

> Congrats on a nice quarter. I wanted to talk about the leverage we saw down the P&L. It was pretty impressive. It will be by like 150 bps on operating margin. So just wanted to see how we should think about gross margin progression, operating margin progression throughout the year, I saw the reiterated guidance but just trying to think about cadence, especially in light of the Stelo launch and the key drivers of that upside in the quarter and how we should think about that moving through the year?

89.    Defendant Sylvain responded by stating the following:

> Yes. Sure, Robbie. Thanks for the question. ***The way to think about gross margin and is that of course over the course of the year, we talked -- when we set guidance that this was going to look a little bit like a more typical year. And in a more typical year, you generally see 300 to 400 basis points of expansion over the course of the year. And that's what I'd expect to see over the course of this year.***
>
> A lot happened last year with the transition from G6 to G7. It's not a typical year. We had a new manufacturing facility coming online. But as you kind of

go back into years prior to that, you see that sort of cadence. That's how we're thinking about it, at least over the course of the year right now. And so that gives you some context for that cadence from an op margin perspective or at least an OpEx spend perspective, we've already made the investment in the sales force. And so that you see playing through in the first quarter. And to your point, you saw some nice leverage in the first quarter.

We will be making investments, further investments in Japan here as we go live in the second quarter, and that will play out over the course of the year. And then obviously, associated with the launch of Stelo over the course of the summer, we'll be making investments there. So while we won't get the same leverage that you ultimately saw in the first quarter over the balance of the year. You should expect some leverage over the course of the year, and that ultimately contributes down to what you'd see as an expansion of op margin despite a gross margin guide, that's about a bit of a click back from the prior year. So that's the way to think about it.

In terms of the over performance in the Q1, I think you're alluding to the beat in terms of op margin. I think the takeaway here is it's an encouraging sign for us. ***We've demonstrated over the past few years, we can drive leverage into this business. This year is no exception.*** All of the efforts that we've been talking about in prior years continue. However, it's a little early to change how we're thinking about the full year first quarter. And as you mentioned, a nice start to the first quarter, and we'll keep you updated on progress as the year progresses.

### *June 5, 2024 William Blair Growth Stock Conference*

90.    On June 5, 2024, Defendant Sylvain attended the 44th Annual William Blair Growth Stock Conference. During the conference, Malgorzata Maria Kaczor Andrew, an analyst from William Blair & Company LLC, asked Defendant Sylvain the following question regarding DexCom's guidance for the 2024 Fiscal Year:

And so maybe just to wrap all of that up, as we think about your guidance both for the second quarter, you did have some comments, maybe you're not specific as much for guidance for Q2. But walk us through what you said on Q2, full year and what was contemplated in that? And then third piece, how does that compare to the Street estimates and whether you're comfortable with that?

91.    Defendant Sylvain responded by stating the following about DexCom's

guidance for the 2024 Fiscal Year:

> Sure. Yes. I think last time we spoke, the question was how you think about the estimates in Q2. We don't guide the quarters. So we said things are reasonable. I think it's a reasonable outcome. And in terms of the full year, as of the last quarter, when we issued our earnings, we raised our guidance. And so that should give -- we obviously beat the Street expectations in the first quarter, raised guidance and continue to do well. So I think from that point of view, I think we're happy with where we are. We're happy with our full year guidance. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

92.    The statements referenced in ¶¶ 72-76 and 86-91 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls.As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

### *July 25, 2024 Press Release*

93.    On July 25, 2024, DexCom issued a press release, that revealed DexCom's poor financial performance for the second quarter of the 2024 Fiscal Year, which the press release stated was partly due to "slower-than-expected new customer growth":

> • Revenue grew 15% year-over-year to $1.004 billion on a reported basis and 16% year-over-year on an organic basis.

> • U.S. revenue grew 19% and international revenue grew 7% on a reported basis and 10% on an organic basis, all on a year-over-year basis.

• GAAP operating income of $158.0 million or 15.7% of revenue, an increase of 100 basis points compared to the second quarter of 2023. Non-GAAP operating income of $195.4 million or 19.5% of reported revenue, an increase of 130 basis points compared to the second quarter of 2023.

* * *

Third Quarter and 2024 Annual Guidance and $750 Million Share Repurchase Program

* * *

• Revenue of approximately $4.00 - 4.05 billion (11 - 13% organic growth)

• Non-GAAP Gross Profit Margin of approximately 63%

• Non-GAAP Operating Margin of approximately 20%

• Adjusted EBITDA Margin of approximately 29%

***In addition, to account for certain unique items impacting 2024 seasonality, the company is establishing guidance for third quarter 2024 Revenue of approximately $975 million to $1.00 billion (1 - 3% organic growth).***

The company also announced a $750 million share repurchase program in conjunction with second quarter results.

94.    The press release quoted Defendant Sayer: "While Dexcom advanced several key strategic initiatives in the second quarter, our execution did not meet our high standards."

***July 25, 2024 Earnings Conference Call***

95.    Later that day, on July 25, 2024, DexCom held an earnings conference call with analysts and investors to discuss DexCom's financial performance for the second quarter of the 2024 Fiscal Year. During the call, Defendant Sayer revealed:

First, ***as we've worked through our U.S. sales force realignment expansion, we have seen our share of new customers fall short of our expectations*** despite still strong absolute customer additions. Second, our U.S. revenue per customer has stepped down faster than expected based on 2 primary drivers: rebate eligibility and channel mix.

* * *

U.S. customer growth has remained strong in our pharmacy business as we expand our reach into primary care and type 2 diabetes more broadly. ***However, our growth in the DME channel has trailed our plan. The DME distributors remain important partners for us in our business, and we've not executed well this quarter against these partnerships. We need to refocus on those relationships.***

Finally, ***our international performance was also lighter than expectations in the quarter***. While we delivered strong performance in some of our core markets such as the U.K. and France, we saw category growth soften in certain geographies as type 1 penetration advances in these regions.

96.    Also, during the call, Defendant Sylvain revealed the following regarding DexCom's reduced guidance:

Turning to guidance. Starting with full year 2024, we are decreasing our revenue guidance to a range of $4.00 billion to $4.05 billion, representing organic growth of 11% to 13% for the year. As mentioned earlier, ***the compounding effect of our slower-than-expected new customer growth in the U.S. DME channel and international business as well as increased pharmacy eligibility resulted in the need to recalibrate the guide. Our updated guidance reflects these dynamics and assumes a longer ramp in productivity in our U.S. sales force.*** For margins, we are reducing our non-GAAP gross profit margin guidance to approximately 63%, while maintaining our prior guidance on non-GAAP operating margin and adjusted EBITDA at approximately 20% and 29%, respectively.

In addition to our annual guidance, we are providing 2 additional data points to help investors and analysts understand some of the unique elements impacting our revised guidance in 2024. First, the impact to new patients from our sales force initiative combined with our revenue per customer trends that Kevin detailed will change the historical seasonality pattern that we have typically experienced. These impacts are expected to reach their peak in the third quarter, with total revenue expected to be between $975 million and $1 billion. In conjunction with this revenue outlook, we thought it would be helpful to provide a midyear update on our global active customer base, which we now estimate to be between 2.5 million and 2.6 million. This represents strong growth over where we finished 2023, though the growth percentage has decelerated slightly. Our hope is these updates will provide additional

visibility as our team works to implement several of the areas of focus that we have aligned on over the past month and as our sales force continues to ramp their efficiency.

97.    On this news, the price of the Company's common stock fell $43.85 per share, or approximately 40.66%, from its closing price of $107.85 per share on July 25, 2024, to close at $64.00 per share on July 26, 2024.

## DAMAGES TO DEXCOM

98.    As a direct and proximate result of the Individual Defendants' misconduct, DexCom has lost and will continue to lose and expend many millions of dollars.

99.    Such expenditures include, but are not limited to, any internal investigations, legal advisory, and other professional service fees incurred in defending any investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100.    Such expenditures include expenses associated with the Company's failure to maintain internal controls and the failure to file accurate reports with the SEC.

101.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

102.    As a direct and proximate result of the Individual Defendants' conduct, DexCom has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

103.    Plaintiff brings this action derivatively and for the benefit of DexCom to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of DexCom, violations of the Exchange Act, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof.

104.    DexCom is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105.    Plaintiff is, and has been at all relevant times, a shareholder of DexCom. Plaintiff will adequately and fairly represent the interests of DexCom in enforcing and prosecuting his rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

106.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

107.    A pre-suit demand on the Board of DexCom is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol (the "Directors"). Plaintiffs need only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

108.    To date, Directors Sayer, Altman, Foletta, and Heller have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

109.    Additional reasons that demand on Defendant Sayer is futile follow. Defendant Sayer has served as a Company director since November 2007, as Chairman of the Board since July 2018, as the Company's President since 2011, and as the Company's CEO since January 2015. As the Company's highest officer and Chairman of the Company, Defendant Sayer bears significant culpability for the issuance of false and misleading statements during the Relevant Period. These include the false and misleading statements in the 2024 Proxy Statement, which he solicited. The false and misleading statements in the 2024 Proxy Statement contributed to Defendant Sayer's re-election to the Board. The Company provides Defendant Sayer with his principal occupation for which he receives handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the

directors that control his continued employment, other members of management with whom he worked or still works, and himself. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Sayer has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made staggering insider sales totaling more than $22.3 million, and were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants. For these reasons, Defendant Sayer breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Altman is futile follow. Defendant Altman has served as a Company director since 2013. As a trusted Company director, Defendant Altman solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Altman with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein.

Moreover, Defendant Altman has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales totaling more than $192,000, which were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants. For these reasons, Defendant Altman breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.   Additional reasons that demand on Defendant Augustinos is futile follow. Defendant Augustinos has served as a Company director since 2009. As a trusted Company director, Defendant Augustinos solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Altman, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Augustinos with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Augustinos breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.   Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since 2017. As a trusted Company director, Defendant Collins solicited the false and misleading 2024 Proxy Statement. The

false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Altman, Augustino, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Collins with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Collins breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Dahut is futile follow. Defendant Dahut has served as a Company director since 2020. As a trusted Company director, Defendant Dahut solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of herself and Defendants Sayer, Altman, Augustino, Collins, Driscoll, Foletta, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Dahut with handsome compensation. Thus, she cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Dahut breached her fiduciary duties to the Company, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Driscoll is futile follow. Defendant Driscoll has served as a Company director since 2023. As a trusted Company director, Defendant Driscoll solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of herself and Defendants Sayer, Altman, Augustino, Collins, Dahut, Foletta, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Driscoll with handsome compensation. Thus, she cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Driscoll breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Foletta is futile follow. Defendant Foletta has served as a Company director since 2014. As a trusted Company director, Defendant Foletta solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Heller, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Foletta with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause

the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Foletta has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales totaling more than $701,192, which were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes him unlikely to investigate any misconduct committed by the Individual Defendants. For these reasons, Defendant Foletta breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116. Additional reasons that demand on Defendant Heller is futile follow. Defendant Heller has served as a Company director since 2019. As a trusted Company director, Defendant Heller solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of herself and Defendants Sayer, Altman, Augustino, Collins, Dahut, Foletta, Driscoll, Malady, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Heller with handsome compensation. Thus, she cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Moreover, Defendant Heller has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales totaling more than

$113,000, which were the product of the Individual Defendants' false and misleading statements alleged herein, and which further makes her unlikely to investigate any misconduct committed by the Individual Defendants. For these reasons, Defendant Heller breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Malady is futile follow. Defendant Malady has served as a Company director since 2020. As a trusted Company director, Defendant Malady solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Heller, Foletta, and Topol to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Malady with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Malady breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Topol is futile follow. Defendant Topol has served as a Company director since 2009. As a trusted Company director, Defendant Topol solicited the false and misleading 2024 Proxy Statement. The false and misleading statements in the 2024 Proxy Statement contributed to the re-election of himself and Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Heller,

Foletta, and Malady to the Board, allowing them to continue breaching their fiduciary duties to the Company. The Company also provides Defendant Topol with handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the Directors. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Topol breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    DexCom has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for DexCom any part of the damages DexCom suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

120.    The acts complained of herein constitute violations of fiduciary duties owed by DexCom's officers and directors, and these acts are incapable of ratification.

121.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of DexCom. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of DexCom, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be

expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

122.    If there is no directors' and officers' liability insurance, then the Directors will not cause DexCom to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

123.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

126.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

127.    Under the direction and watch of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, Kahn, and Topol, the 2024 Proxy Statement failed to disclose: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

128.    Moreover, the 2024 Proxy Statement failed to disclose that the Company's Code of Conduct were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

129.    Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, Kahn, and Topol knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of directors.

130.    As a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, Kahn, and Topol causing the 2024 Proxy Statement to

be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them, beside Kahn, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

131.   The Company was damaged as a result of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, Kahn, and Topol's material misrepresentations and omissions in the 2024 Proxy Statement.

132.   Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

133.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DexCom's business and affairs.

135.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

136.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DexCom.

137.   In breach of their fiduciary duties owed to DexCom, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) DexCom's sales team was not adequately prepared to facilitate the growth plan touted by the Individual Defendants; (2) seasonality and macroeconomic conditions posed significant risks to DexCom's financial performance; (3) DexCom was not capable of simultaneously growing its customer base sufficiently and maintaining its existing distribution channels; and (4) DexCom failed to maintain adequate internal controls. As a

result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

138.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

139.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

140.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

141.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DexCom's securities.

142.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DexCom's securities. The Individual Defendants, in good

faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

143.  These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

144.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DexCom has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145.  Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## THIRD CLAIM
### Against Individual Defendants for Unjust Enrichment

146.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DexCom.

148.  The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from DexCom that was tied to the performance or artificially inflated valuation of DexCom, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

149.  Plaintiff, as a shareholder and representative of DexCom, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

150.  Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

151.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DexCom, for which they are legally responsible.

153.  As a direct and proximate result of the Individual Defendants' abuse of control, DexCom has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154.  Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

155.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DexCom in a manner consistent with the operations of a publicly-held corporation.

157.  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DexCom has sustained and will continue to sustain significant damages.

158.  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

159.  Plaintiff, on behalf of DexCom, has no adequate remedy at law.

### SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

160.  Plaintiffs incorporate by reference and reallege each and every allegation set

forth above, as though fully set forth herein.

161.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

162.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused DexCom to waste valuable corporate assets while DexCom suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions and investigations and the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

163.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

164.   Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Sayer and Sylvain for Contribution Under Sections 10(b) and 21D of the Exchange Act

165.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.   DexCom and Defendants Sayer and Sylvain are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sayer and Sylvain's willful and/or reckless violations of their obligations as officers and/or directors of DexCom.

167.   Defendants Sayer and Sylvain, because of their positions of control and

authority as officers and/or directors of DexCom, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DexCom, including the wrongful acts complained of herein and in the Securities Class Action.

168.    Accordingly, Defendants Sayer and Sylvain are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

169.    As such, DexCom is entitled to receive all appropriate contribution or indemnification from Defendants Sayer and Sylvain.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of DexCom, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DexCom;

(c)    Determining and awarding to DexCom the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing DexCom and the Individual Defendants to take all necessary actions to reform and improve DexCom's corporate governance and internal procedures to comply with applicable laws and to protect DexCom and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of DexCom to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)      Awarding DexCom restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2024                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT